296 Ga. 549
FINAL COPY

S14A1703. BUN v. THE STATE.

THOMPSON, Chief Justice.

A jury found appellant Veasa Bun guilty of malice murder and other crimes in connection with the shooting death of Sheriff's Deputy Richard Daly.[1] Bun, who was seventeen years old at the time the crimes were committed, was sentenced to life without parole plus an additional seventy years of imprisonment. His motion for new trial asserting numerous grounds of error was denied, and he appeals, arguing that his sentence constitutes cruel and unusual punishment under both the federal and Georgia Constitutions and that his trial counsel provided ineffective assistance. For the reasons that follow, we

---

[1] Bun was indicted on November 2, 2011, by a Clayton County grand jury on charges of malice murder, felony murder, four counts of aggravated assault on a peace officer, five counts of obstruction of an officer, five counts of possession of a firearm during the commission of a felony, two counts of aggravated assault, and one count of theft by receiving a stolen firearm. A jury found him guilty of all counts except one count of aggravated assault on a peace officer, one count of obstruction of a police officer, one count of aggravated assault, and one count of possession of a firearm during the commission of a felony. The felony murder conviction was vacated by operation of law, and one of the aggravated assault verdicts merged into the malice murder verdict. On August 9, 2012, the trial court sentenced Bun to serve life in prison without parole for the malice murder conviction and an additional seventy years for the remaining convictions. Bun filed a motion for new trial on August 10, 2012, which was denied on March 7, 2014, following a hearing. Bun's notice of appeal was filed on March 17, 2014. The case was docketed in this Court for the September 2014 term and submitted for decision on the briefs.

affirm.

1. The evidence presented at trial, considered in the light most favorable to the verdict, shows that on July 20, 2011, Deputy Daly and several other law enforcement officers pulled over a vehicle in which Bun was a passenger. Bun had been identified as a passenger in the vehicle by an officer who knew there was an outstanding warrant for Bun's arrest in connection with a previous robbery and aggravated assault. As Daly and the other officers approached the stopped vehicle, Bun grabbed and cocked a gun, stepped out of the car, and fatally shot Daly twice in the abdomen. Bun then shot at other officers as he fled into the nearby woods.

We conclude the evidence adduced at trial was sufficient to authorize a rational jury to find Bun guilty beyond a reasonable doubt of the crimes for which he was convicted. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Relying on the United States Supreme Court's decisions in Roper v. Simmons, 543 U. S. 551 (125 SCt 1183, 161 LE2d 1) (2005), Graham v. Florida, 560 U. S. 48 (130 SCt 2011, 176 LE2d 825 ) (2010), and Miller v.

2

Alabama, 567 U. S. ___ (132 SCt 2455,183 LE2d 407) (2012),[2] Bun argues that imposition of a sentence of life without parole on a juvenile defendant in a homicide case constitutes cruel and unusual punishment in violation of the federal and state constitutions.[3] The identical issue was raised and decided adversely to Bun in Foster v. State, 294 Ga. 383, 387 (11) (754 SE2d 33) (2014), based on this Court's recognition that OCGA § 16-5-1 does not under any circumstance *mandate* life without parole but gives the sentencing court discretion over the sentence to be imposed after consideration of all the circumstances in a given case, including the age of the offender and the

---

[2] In Roper, the United States Supreme Court held that a sentence of death imposed against a juvenile offender is disproportionate to his or her "diminished culpability" and violates the United States Constitution's ban on cruel and unusual punishment. U. S. Const. Amend. VIII. Five years later, in Graham, supra, 560 U. S. at 79, the Supreme Court held that a sentence of life without parole cannot be constitutionally imposed upon a juvenile convicted of a non-homicide crime. In reaching that conclusion, the Court weighed the extreme severity of the punishment of life without parole against the "limited culpability of juvenile . . . offenders." 132 SCt at 74. The Supreme Court extended its ruling in Graham when, in Miller, it held invalid a law imposing a *mandatory* sentence of life without parole in juvenile homicide cases. The Court reasoned that "making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence . . . poses too great a risk of disproportionate punishment." Id. at 2469. The Supreme Court emphasized, however, that it was not creating a categorical bar prohibiting a sentence of life without parole in juvenile homicide cases and was not "foreclos[ing] a sentencer's ability to make that judgment in homicide cases." Id.

[3] Prior to sentencing, Bun filed a motion to declare the imposition of a sentence of life without parole unconstitutional because of his status as a juvenile offender. The trial court denied Bun's motion after conducting a pre-sentence hearing.

3

mitigating qualities that accompany youth. See former OCGA § 16-5-1 (d)[4] ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."). See also Miller, supra, 132 SCt at 2469. Other courts, including the Eleventh Circuit Court of Appeals and numerous state courts, have similarly concluded that the Supreme Court's decisions in Roper, Graham, and Miller do not stand for or demand the conclusion that a sentencing court is categorically barred from sentencing juveniles in a homicide case to life imprisonment without the possibility of parole. See Loggins v. Thomas, 654 F3d 1204, 1221-1222 (11th Cir. 2011) and cases cited therein (neither Roper nor Graham held or said that the Constitution bars a life without parole sentence for a juvenile convicted of murder; "[i]f anything, Roper implies that it is permissible"); Commonwealth of Pennsylvania v. Batts, 620 Pa. 115, 131-132 (66 A3d 286 ) (Pa. 2013) (Miller did not bar imposition of a life-without-parole sentence on a juvenile categorically); State v. Allen, 289 Conn. 550, 585 (958 A2d 1214) (Conn. 2008) ("The courts are in consensus, however, that the United States Supreme Court clearly has signaled that [a life without parole] sentence [for a juvenile offender]

---

[4] This provision is now codified at OCGA § 16-5-1 (e) (1).

does not violate the eighth amendment"); Wallace v. State, 956 A2d 630, 641 (Del. 2008) ("the United States Supreme Court, in Roper, would not have recognized a sentence of life without parole as an acceptable alternative to death as a punishment for juveniles who commit [murder], if such a sentence would violate the Eighth Amendment"); State v. Pierce, 223 Ariz. 570, 571-572 (225 P3d 1146) (Ariz. App. 2010) (the Supreme Court in Roper "expressly intimated that a natural life sentence for a juvenile who committed murder is not unconstitutionally cruel and unusual"). See also State v. Long, 138 Ohio St.3d 478 (II) (C) (8 NE3d 890) (Ohio 2014); Conley v. State, 972 NE2d 864 (IV) (Ind. 2012); State v. Golka, 281 Neb. 360, 382 (796 NW2d 198) (Neb. 2011); State v. Andrews, 329 SW2d 369, 376-377 (Mo. 2010). We, therefore, reject Bun's invitation to extend the holdings of Roper, Graham, and Miller and affirm the trial court's denial of his motion for new trial on this ground.[5]

3. Bun also claims he was entitled to a new trial because his trial counsel

_____

[5] Although Bun has not asserted an as applied cruel and unusual punishment claim, the trial court's order and sentencing transcript make clear that the trial court considered Bun's youth and its accompanying attributes in making its sentencing decision and whatever the significance attributed to Bun's youth, the trial court found it was outweighed by the severity of his crimes, his criminal history, and his lack of remorse.

rendered ineffective assistance by failing to object to the testimony of Tracy Graham-Lawson, a former juvenile judge who had presided over a number of Bun's juvenile cases but is no longer acting in any judicial capacity. To establish ineffective assistance of counsel, Bun must show both that trial counsel's performance was professionally deficient and that but for the deficient performance there is a reasonable probability that the result of the proceedings would have been different. Strickland v. Washington, 466 U. S. 668, 695 (104 SCt 2052, 80 LE2d 674) (1984); Wesley v. State, 286 Ga. 355 (689 SE2d 280) (2010). A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. Strickland, supra, 466 U. S. at 689. "If there is no showing of deficient performance, we need not address the prejudice issue." Romer v. State, 293 Ga. 339, 344 (745 SE2d 637) (2013).

Lawson's testimony, offered during the sentencing phase of trial, related to factual information from Bun's juvenile court records, including information regarding Bun's delinquency dispositions, involvement in gang activity, poor academic record, psychological disorders, and drug use. She also offered her view that Bun's juvenile record indicated he was a threat to society and that he

6

should receive a sentence of life without parole.  On appeal, Bun claims counsel should have objected to Lawson's testimony because it was prohibited under Canon 2 of the Georgia Code of Judicial Conduct which states that judges "shall avoid impropriety and the appearance of impropriety in all their activities" and "should not testify voluntarily as . . . character witness[es]."  Canon 2 A. and 2 B., Georgia Code of Judicial Conduct.

Bun's reliance on the Code of Judicial Conduct as the ground for exclusion of Lawson's testimony is misplaced.  The Code of Judicial Conduct, which is intended "to provide a structure for regulating [judicial] conduct through disciplinary agencies," is limited in its application to officers "of a judicial system performing judicial functions" and, in some circumstances, to judicial candidates.  See the Georgia Code of Judicial Conduct, Preamble, and Application of the Code of Judicial Conduct ("Anyone . . . who is an officer of a judicial system performing judicial functions . . . is a judge for the purpose of this Code.").  Thus, even assuming the Code of Judicial Conduct could be asserted in a criminal proceeding as a basis for the exclusion of evidence, the Code did not apply to Lawson because she was not a judge or judicial candidate at the time her testimony was given.  Counsel's failure to raise a meritless

objection did not amount to ineffective assistance.[6]  See Oliphant v. State, 295

Ga. 597, 600 (2) (a) (759 SE2d 821) (2014).

Judgment affirmed.  All the Justices concur, except Benham and Hunstein,

JJ., who dissent.

BENHAM, Justice, dissenting.

For the reasons set forth below, I respectfully dissent to the majority

opinion.

1.  The appropriate punishment for juvenile offenders has been an

evolving area of the law for the past decade.  Beginning in 2005, the U. S.

Supreme Court held that juvenile offenders could not receive the death penalty.

---

[6]  We note that trial counsel testified at the motion for new trial hearing that he made a conscious decision not to object to Lawson's testimony because he believed the testimony was admissible and he did not want the judge to think he was "hiding anything."  Under Georgia law, a defendant's juvenile court records can be considered by a trial court in the sentencing phase after conviction of a felony, and in fact, Bun's juvenile records were admitted at the sentencing hearing for the trial court's consideration.  See OCGA § 15-11-703.  See also Burrell v. State, 258 Ga. 841 (7) (376 SE2d 184) (1989) (recognizing that former OCGA § 15-11-38 (b), now codified at OCGA § 15-11-703, specifically provides that a defendant's juvenile records may be introduced during the sentencing phase of trial).

Roper v. Simmons, 543 U. S. 551 (125 SCt 1183, 161 LE2d 1) (2005).  Five years later, in Graham v. Florida, 560 U. S. 48 (130 SCt 2011, 176 LE2d 825) (2010), the United States Supreme Court held that a juvenile offender who had not committed a homicide could not be sentenced to life without parole.  In 2012, the United States Supreme Court struck down mandatory sentences of life without parole for juveniles who had committed homicide.  Miller v. Alabama, __ U. S. __ (132 SCt 2455, 183 LE2d 407) (2012).  Roper, Graham, and Miller are all predicated on the fact that juveniles, who are biologically and emotionally immature, are less culpable than adults for their actions.[7]  As the law now stands under Miller, lower courts must exercise discretion when

_____

[7] Dr. Peter Ash, a psychiatrist who was tendered as an expert in juvenile culpability during the proceedings against Bun and who had contributed to briefing submitted in Roper and Graham, testified in pertinent part as follows:

Q.  And is the juvenile, is he as culpable as an adult?
A.  Generally speaking, no.
Q. And what's the reason for that?
A.  Well there are a lot of reasons.  The Supreme Court sort of has parched it out into three main ones which I think are useful to think about.
    The first is that adolescents are impulsive and immature and we know this both from behavioral studies and the behavioral studies are kind of supported by a lot of work in neuro-biology and brain scanning that's been done more recently than that.
    And we know a fair bit about how that progresses through adolescence and [in] particular that adolescents tend to be much more focused on immediate rewards and pay less attention to risk.
    Also we know under conditions of emotional stress[,] their decision making gets appreciably worse than what happens to adults.

considering whether to impose a life sentence without parole for a juvenile

offender who has committed homicide.

Georgia's law in regard to homicide and sentencing has also undergone

some change in the last decade. In April 2009, the General Assembly enacted

Ga. L. 2009, p. 223, § 1 which amended OCGA § 16-5-1 to add the sentence of

life in prison without the possibility of parole as one of the punishments for

murder.[8]  See OCGA § 16-5-1 (e) (1).  Prior to April 2009, the sentence of life

without parole was not a sentencing option for any defendant, regardless of his

age, in a non-capital murder case.  See State v. Ingram, 266 Ga. 324 (467 SE2d

523) (1996) (the sentence of life without parole is only available in those cases

in which the State seeks the death penalty). Given the U.S. Supreme Court's

holding in Roper, supra, had Bun committed his crimes between 2005 and April

2009, rather than in 2011, the only available sentence would have been life with

the possibility of parole.  See Moore v. State, 293 Ga. 705 (2) (749 SE2d 660)

(2013).  There is nothing in the legislative history of the 2009 amendment to

---

[8] The bill also repealed OCGA §§ 17-10-31.1 and 17-10-32.1, thereby removing requirements that a jury find an aggravating circumstance before imposing the sentence of life without parole (OCGA § 17-10-31.1) and removing the sentencing duties of a judge regarding a person who pled guilty to an offense for which the death penalty or life without parole could be imposed (OCGA § 17-10-32.1).  See Ga. L. 2009, p. 223, § 5.

3

OCGA § 16-5-1 indicating that the legislature considered, researched, or analyzed the propriety or impact of life without parole sentences on juvenile offenders who commit homicide.[9]

While it is clear that federal law allows life without parole sentences to be exacted on juvenile offenders who commit homicide as a matter of judicial discretion, the federal law does not prohibit this state from disallowing such sentences for juvenile offenders as a matter of state constitutional law. "It is a well-recognized principle that a state court is free to interpret its state constitution in any way that does not violate principles of federal law, and thereby grant individuals more rights than those provided by the U. S. Constitution." Powell v. State, 270 Ga. 327, 331, n. 3 (510 SE2d 18) (1998). Indeed, on many occasions this Court has held that the Georgia Constitution affords our citizens broader rights than the federal constitution. See, e.g., Statesboro Publishing Co. v. City of Sylvania, 271 Ga. 92 (2) (516 SE2d 296)

---

[9] The likely impetus for the amendment to OCGA § 16-5-1 was the costs to this state for pursuing the death penalty against courthouse shooter Brian Nichols, an adult offender who was ultimately sentenced to life in prison without parole. See Death Penalty Information Center, *Smart on Crime: Reconsideration of the Death Penalty in a Time of Economic Crisis*, p. 13 (October 2009) (death penalty prosecution of Brian Nichols cost the state approximately $2 million, making it difficult for the state to provide funding for indigent defense in other cases). See also Ga. L. 2009, p. 223, § 5/SB13. (purpose of amendment is "to provide for the imposition of life without parole of persons convicted of murder independently of a death penalty prosecution").

(1999) (Georgia Constitution affords broader free speech protection than the First Amendment of the U. S. Constitution); Grissom v. Gleason, 262 Ga. 374, n. 1 (418 SE2d 27) (1992) (Georgia Constitution's equal protection provision may provide greater rights than U. S. Constitution); Green v. State, 260 Ga. 625, 627 (398 SE2d 360) (1990) (Georgia Constitution provides broader protection than U. S. Constitution for right against self-incrimination); Fleming v. Zant, 259 Ga. 687, 690 (386 SE2d 339) (1989) (Georgia Constitution provides greater protection against cruel and unusual punishment than U. S. Constitution); Colonial Pipeline Co. v. Brown, 258 Ga. 115 (3) (365 SE2d 827) (1988) (Georgia Constitution provides greater protection against excessive fines and forfeitures than U. S. Constitution).

In Georgia, we treat juveniles differently than adults as evidenced by our institutions (i.e., juvenile courts) and laws. See, e.g., OCGA § 17-10-14 (a) (requiring juveniles who are sentenced to life in prison and who are younger than 17 to serve their time in a juvenile detention facility). As a state constitutional matter, we give up nothing by leaving open for juvenile offenders the possibility of rehabilitation and redemption for crimes they commit when they are biologically and emotionally immature. Indeed, life with the possibility

5

of parole is not a "light" sentence for a juvenile offender. A person sentenced to life with the possibility of parole in this state must serve 30 years in prison before becoming eligible for parole. OCGA § 17-10-6.1 (c) (1). Eligibility for parole does not mean a person will be released, but simply means the person may be considered for release by the State Board of Pardons and Paroles. A person very well could spend the entirety of his natural life in prison while being parole-eligible in this state.

Here, in addition to his life sentence without parole, Bun has been sentenced to serve a consecutive term of 70 years. Thus, even if parole eligibility was not at issue, the State has ensured that this young man will be a prisoner well into his eighties. Imposing such exorbitant sentences on juvenile offenders means we have given up all hope for their rehabilitation. This is in direct odds with the observation in Roper that "juvenile offenders cannot with reliability be classified among the worst offenders." 543 U. S. at 569.[10]

Accordingly, because I believe it constitutes cruel and unusual punishment

---

[10] Indeed, Dr. Ash also testified: "We don't make, for example, diagnosis of anti-social personality in adolescents, you have to wait until they're 18. Part of that is or what goes along with that is we really cannot predict what someone, even a severe offender, an adolescent, is going to be like as an adult."

6

under our state constitution to impose the sentence of life without parole on a juvenile offender who commits homicide, I cannot join the majority opinion.[11]

2. In addition to the constitutionality of the sentence imposed, I write because the testimony of Tracy Graham-Lawson is deeply troubling whether or not an ethical violation occurred regarding her former status as a juvenile court judge for Clayton County. I believe counsel was deficient when he failed to object to her testimony at the sentencing hearing and that such deficiency was prejudicial to Bun.

Lawson, who was never tendered as an expert, was allowed to testify, among other things, that Bun began his "criminal career"[12] at the age of ten, that she had Bun detained at the age of 13 because she was afraid of him, and that no one could change his behavior patterns. Although Lawson was no longer a juvenile court judge with any authority over Bun after December 2008, she was also allowed to testify about incidents occurring after her judicial tenure and for

---

[11] Such a result is not precluded by Foster v. State, 294 Ga. 383 (11) (754 SE2d 33) (2014) because that case did not address whether a life sentence without parole for a juvenile offender is cruel and unusual punishment under our state constitution, but was decided solely on federal constitutional grounds. Here, appellant has clearly raised a state constitutional issue.

[12] Bun's juvenile record was comprised of carrying a knife to school, trespass, drug and alcohol abuse, running away from home, and burglary. He also was affiliated with a gang and had some physical altercations with his siblings.

7

which she could not possibly have first-hand knowledge.[13] Lawson called Bun a "menace to society," she said that Bun "scared [her] from the very beginning," and opined, "You can't change this young man, I'm convinced of it." Lawson also said she knew the victim, said the victim was "a wonderful human being," and said she disqualified herself from prosecuting Bun in the instant case because she believed she could not be impartial.

Whether or not allowing Lawson to testify was a technical violation of judicial ethics, her testimony certainly had the appearance of impropriety inasmuch as Lawson was given a platform, under the guise of her professional status as a former juvenile court judge, to give her personal opinions about Bun while simultaneously admitting she could not be impartial where Bun was concerned. The fact that Lawson was no longer a judge at the time of her testimony does not mitigate the prejudicial effect the weight of her opinions had on the outcome of Bun's sentencing. Indeed, I can think of no case where a former judge has testified against a defendant in a current criminal proceeding and essentially testified as to her personal opinion on the defendant's

---

[13] For example, Lawson was allowed to testify, without objection, about an incident that occurred in South Carolina over a year after she had left the juvenile court.

8

predilection for criminality. When a defendant has a prior criminal record, we allow the certified copy of that prior record to speak for itself. We do not allow former prosecutors, former defense attorneys, and former judges involved in the prior case to testify about a defendant's character for sentencing purposes or otherwise.

I believe the fact that counsel made no effort to prohibit Lawson from testifying rose to the level of constitutionally ineffective assistance such that Bun is entitled to relief. Accordingly, I cannot join the majority opinion.

I am authorized to state that Justice Hunstein joins in this dissent.


Decided February 16, 2015.

Murder. Clayton Superior Court. Before Judge Benefield.

Jimmonique R. S. Rodgers, Christopher R. Geel, Long D. Vo, for appellant.

Tracy Graham-Lawson, District Attorney, Elizabeth A. Baker, Erman J. Tanjuatco, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine L. Iannuzzi, Assistant Attorney General,

for appellee.